The **FIRST NATIONAL BANK OF JULESBURG, a National Association, Petitioner,**

v.

The **BANKING BOARD OF the STATE of Colorado and Harry Bloom, State Bank Commissioner, and their successors in office, Dennis Kugler, James Socoll, Darris Cumming, Donald Olson, and Douglas Kinzie, as applicants for Charter for the proposed Sedgwick County Bank, Respondents.**

No. 80CA1235.

Colorado Court of Appeals,
Div. III.

March 31, 1983.

Hays & Wilson, Frank L. Hays, James C. Wilson, Jr., Eason, Sprague & Wilson, Richard Eason, Denver, for petitioner.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Richard H. Goldberg, Asst. Atty. Gen., Denver, for respondents The Banking Bd. of the State of Colorado and Harry Bloom, State Bank Com'r.

Ellison, Ward & McCrea, Clinton P. Swift, Denver, for respondents Dennis Kugler, James Socoll, Darris Cumming, Donald Olson, and Douglas Kinzie, as applicants for Charter for the proposed Sedgwick County Bank.

BERMAN, Judge.

The First National Bank of Julesburg petitions for review of a decision by the Banking Board (Board) which granted a charter to the Sedgwick County Bank. We affirm.

In 1979, applicants, incorporators of the Sedgwick County Bank, filed for a charter with the Division of Banking. The bank was to be located in the vicinity of Julesburg, Colorado. Each incorporator subscribed 20% of the proposed stock and agreed to pay the total purchase price "in cash upon demand prior to or commensurate with the granting of a charter to the proposed bank."

Petitioner, the only commercial bank in Julesburg at the time, entered its appearance before the Board protesting the issuance of the charter. A prehearing conference was held, at which time petitioner moved to dismiss the application. In support of its motion, petitioner argued that the applicants had failed to comply with § 11–3–109(1), C.R.S.1973, which states, in part:

"After the capital stock has been fully subscribed, the incorporators shall make application to the commissioner for a charter. The incorporators shall submit to the commissioner the following

. . . .

(b) ... the amount to be borrowed and from whom borrowed on any stock issued to a subscriber to more than five percent of the capital stock."

The motion was denied. A summary of reasons for denial is found in the prehearing summary, as follows:

"[F]requently applications don't disclose how the purchase price of the stock will be financed since financial institutions will not discuss financing until favorable action is taken on the charter. Since the commission[er] has already favorably passed on the financial status of the incorporators consistent with their responsibilities and duties under section 11–3–110(1), the chair ruled that no prejudice has inured to the detriment of protestant and therefore denied the motion to dismiss."

Two weeks later, a hearing on the application was convened. The Board reviewed the results of the prehearing conference. Petitioner renewed its motion to dismiss the application, and it was again denied. This review was followed by testimony regarding public need and projected profitability of the proposed bank. Opposing views were voiced by applicant's experts, two incorporators, and local business persons who testified on the applicant's behalf, followed by petitioner's president and one expert. Among the exhibits tendered by the applicants, and admitted over petitioner's objection, was a letter sent to petitioner's customers in opposition to a pending branch banking referendum. Shortly after this hearing, the Board granted the charter.

## I.

Petitioner first argues that the applicant's failure to include, in its initial application, information concerning "the amount to be borrowed and from whom borrowed" necessitated denial of the charter. *See*

§ 11–3–109(1)(b), C.R.S.1973. We hold that such a strict reading of the statute is not warranted and, in fact, frustrates the legislative intent behind it.

■ The banking statutes were "intended to insure that, in order to protect the public, a new bank should commence operations with its capital and paid-in surplus intact, and with its organizational expenses paid." *Firstbank of North Longmont v. Banking Board,* 648 P.2d 684 (Colo.App. 1982). It is neither logical nor, in fact, is it practicable to require submission of detailed information regarding borrowings on stock purchases at the time of the application, and such a requirement does nothing to further the above stated legislative intent.

■ First, the statute itself requires such information regarding "any stock *issued* to a subscriber." Section 11–3–109(1)(b), C.R. S.1973 (emphasis added). Although percentages of stock can be subscribed, at the time of the application, no stock can be issued because the capital structure has not yet been determined. The capital structure is generally determined at a later stage in the chartering process. Here, the capital requirement was increased from $125,000, as proposed in the application, to $300,000 at the time the charter was issued, and the surplus was increased from $125,000 to $200,000.

Moreover, § 11–3–109(1)(b) must be read in conjunction with § 11–3–111, C.R.S.1973. *State Board of Medical Examiners v. Jorgensen,* 198 Colo. 275, 599 P.2d 869 (1979). This section states:

"*After the charter has been granted,* the directors may call for the payment of the subscriptions in full within 30 days from the date of the notice thereof. *No shares shall be issued* until the par value and the pro-rata portion of the paid-in surplus *specified in the charter* have been paid in full in cash." (emphasis supplied).

If the stock cannot be issued until the charter is granted, it is internally inconsistent to require that financial information on issued stock be submitted at the time of the application.

We defer to the commissioner's reasoning in denying the motion to dismiss. The appropriate time to require such information is at the time the stock is issued and a loan on the stock is actually obtained, not when the capital structure has not yet been set and prior to the time any financial institution would discuss the loan. The commissioner's construction of the statute, as the administrative official charged with its enforcement, is entitled to great deference by the courts. *See Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1976).

Petitioner argues that the statute's requirement that applicants "shall" submit such financial information permits only a literal interpretation. This argument was disposed of by *Firstbank of North Longmont v. Banking Board, supra.* In that case we held that the word "shall," as it is used in the banking statutes:

"is presumed to have mandatory connotations, unless it is necessary to construe the word as 'may' to give effect to the legislative intent . . . . 'There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure.' "

## II.

Petitioner also argues that the Board's findings relative to profitability were not supported by the evidence. We have reviewed the record, and we decline to overturn these findings. We have previously held that where the inferences to be drawn from the evidence are conflicting, "the reviewing court may not displace an administrative agency's choice between two fairly conflicting views, even though the court could justifiably have made a different choice had the matter been before it *de novo.*" *Walton v. Banking Board,* 36 Colo. App. 311, 541 P.2d 1254 (1975).

## III.

Petitioner's final argument is that the letter sent by petitioner to its customers urging rejection of the branch banking referendum should not have been admitted because it was irrelevant, immaterial, and prejudicial. We hold that the exhibit was properly admitted to impeach the testimony of petitioner's expert. Even if we assume for the purpose of argument that a court might find that the exhibit's potential for prejudice outweighed its relevancy, the rules of evidence are not applied strictly in administrative hearings. *See* § 24–4–105(7), C.R.S.1973 (1982 Repl. Vol. 10); *Campbell v. State,* 176 Colo. 202, 491 P.2d 1385 (1971).

Order affirmed.

KELLY and TURSI, JJ., concur.